NOV 2 2026 AM10:34
FILED - USDC - FLMD - TPA

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

Case No. 8:26-CV-3322-JLB-LSG

KENNETH McCARTHY,

Plaintiff,

v.

PARAMEDICS LOGISTICS

FLORIDA, LLC,

d/b/a SUNSTAR PARAMEDICS, and

INTERNATIONAL ASSOCIATION

OF EMTs

AND PARAMEDICS, LOCAL 5-247,

Defendants.

**COMPLAINT FOR BREACH OF COLLECTIVE BARGAINING AGREEMENT AND BREACH OF DUTY OF FAIR REPRESENTATION**

**Hybrid § 301 Action, 29 U.S.C. § 185**

I.F.P.

## JURY TRIAL DEMANDED

## NATURE OF THE ACTION

**1.** This is a hybrid action under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Plaintiff alleges that Defendant Paramedics Logistics Florida, LLC d/b/a Sunstar Paramedics ("Employer") breached the governing collective bargaining agreement ("CBA") by progressively disciplining and ultimately terminating Plaintiff without just cause, and by using vehicle-monitoring recordings contrary to the incorporated Vehicle Monitoring System Memorandum of Understanding ("MOU"). This action challenges the termination and the disciplinary record upon which the Employer allegedly relied.

**2.** Plaintiff further alleges that Defendant International Association of EMTs and Paramedics, Local 5-247 ("Union"), Plaintiff's exclusive bargaining representative, breached its duty of fair representation in handling Plaintiff's challenge to that discipline and termination.

**3.** Although the Union controlled access to arbitration under the CBA, the Union did not file a grievance challenging Plaintiff's termination, did not interview Plaintiff or the EMT who drove the ambulance during the event resulting in Plaintiff's termination, did not investigate material comparator evidence identified by Plaintiff, and decided not to pursue arbitration.

**4.** Plaintiff alleges that the Employer's breach of the CBA and the Union's breach of its duty of fair representation are the interdependent components of this hybrid § 301 action.

## PARTIES

**5.** Plaintiff Kenneth McCarthy resides in Pasco County, Florida.

**6.** Defendant Employer is a Florida limited liability company that operates ambulance and emergency medical services under the name Sunstar Paramedics, including in Pinellas County, Florida. Defendant Employer's address is 12490 Ulmerton Road, Largo, Florida 33774. Defendant Employer's registered agent for service of process is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

**7.** Defendant Union is a labor organization that represents employees in an industry affecting commerce. It is the exclusive representative of the bargaining unit of full-time and part-time field EMTs, Paramedics, and other classifications employed by Defendant Employer in its Sunstar operations in Pinellas County, Florida. (Exhibit A, Art. 1.1, 1.1.1.) Defendant Union's address is 12490 Ulmerton Road, Largo, Florida 33774.

**8.** Plaintiff was employed by Defendant Employer from October 4, 2021 until August 7, 2026, first as an EMT and then as a Paramedic, in Largo, Florida. As a Paramedic, Plaintiff was the senior member of his crew.

**9.** Plaintiff was a member of the bargaining unit and was covered by the collective bargaining agreement between Defendant Employer and Defendant Union throughout his employment as a Paramedic.

## JURISDICTION AND VENUE

**10.** This action arises under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Count I alleges a violation of a contract between an employer and a labor organization. Count II alleges that Defendant Union breached its duty of fair representation in handling Plaintiff's grievance under that contract.

**11.** This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 185(a), which provides that such suits "may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

**12.** This Court has jurisdiction over Defendant Union under 29 U.S.C. § 185(c) because its duly authorized officers and agents represent and act for employee members in this district. Defendant Union's address, 12490 Ulmerton Road, Largo, Florida 33774, is in Pinellas County, within this District.

**13.** Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in Pinellas County, Florida. Plaintiff worked for Defendant Employer in Pinellas County, and the discipline, termination, and Defendant Union's handling of

Plaintiff's grievance arose from that employment. All four disciplinary actions against Plaintiff took place in Pinellas County. Pinellas County lies within the Tampa Division, to which this action is directly connected.

## FACTUAL ALLEGATIONS

### The Collective Bargaining Agreement

**14.** Defendant Employer and Defendant Union are parties to a collective bargaining agreement effective October 1, 2024 through September 30, 2027 (the "Agreement"). (Exhibit A.)

**15.** Article 20.1 of the Agreement provides: "The Employer shall have the right to discharge and discipline for just cause." (Exhibit A, Art. 20.1.)

**16.** Article 20.2 of the Agreement provides that, to be considered valid, disciplinary action must be issued to an employee within fourteen (14) calendar days after the Employer becomes aware of the occurrence or misconduct claimed. (Exhibit A, Art. 20.2.)

**17.** Article 20.4.1 of the Agreement provides that a corrective action notice shall only be considered for a period of 12 months and thereafter shall not be used for the purpose of progressive discipline. (Exhibit A, Art. 20.4.1.)

**18.** Article 21 of the Agreement establishes a grievance procedure. A grievance arising from employee discipline must be filed within fourteen (14)

calendar days after service of the disciplinary notice on the employee. For discipline resulting in termination, the Union may start at Step 3. (Exhibit A, Art. 20.4.2, 21.2.1.)

**19.** Under Article 21.2.3 of the Agreement, only the Union, "in its sole discretion," may file a demand for arbitration. (Exhibit A, Art. 21.2.3.) Plaintiff had no ability to demand arbitration on his own.

**20.** Under Article 21.6 of the Agreement, arbitration findings and decisions are final and binding on the Employer, the Union, and the employee involved. (Exhibit A, Art. 21.6.)

**The Vehicle Monitoring System MOU**

**21.** Article 19.6 of the Agreement, titled "Vehicle Monitoring System," provides: "The parties have entered into a memorandum of understanding (MOU) providing for the installation and operation of a vehicle monitoring system in its ambulance units. The MOU is attached as Appendix F and made a part of this Agreement." (Exhibit A, Art. 19.6; Exhibit C.) That memorandum of understanding is referred to below as the "MOU." The MOU concerns the Samsara vehicle monitoring system in Defendant Employer's ambulances.

**22.** Paragraph D of the MOU provides: "The Employer agrees it will not access the video functionality of the crew cab camera unless reviewing a harsh

event notification or in response to a written complaint of unsafe conduct or other policy violation." (Exhibit C, MOU ¶ D.)

**23.** Paragraph E of the MOU states that events are "triggered by g-force (including but not limited to impacts, sudden swerves, rapid acceleration or sudden deceleration) and/or manual activation ('emergency' button)," and that the Employer may use digital clips from a triggering event "up ninety (90) seconds prior to the event, and up to ninety (90) seconds post event for the purposes of investigation and documentation." (Exhibit C, MOU ¶ E.)

**24.** Paragraph F of the MOU provides: "When applicable, the Employer will meet with the employee(s) involved in harsh events to assist in determining the cause of the activation(s)." (Exhibit C, MOU ¶ F.)

**25.** Paragraph H of the MOU provides: "The Employer agrees that vehicle monitoring recordings, unless supportive of just cause, shall not be used for corrective action(s)." (Exhibit C, MOU ¶ H.)

**26.** Paragraph I of the MOU provides: "if recorded events information is used as evidence to support disciplinary action as the result of an investigation, the affected employee(s) and appropriate Union representative(s) will be allowed to view the images and provided a copy upon request. Employees have the right to Union representation during investigations in accordance with labor law and the collective bargaining Agreement." (Exhibit C, MOU ¶ I.)

**Defendant Employer's Progressive Discipline Policy**

**27.** Defendant Employer's Employee Handbook (November 2025) states at Section 12.8 that it "shall apply corrective action in such a manner that employees receive fair and consistent treatment in the resolution of policy violations, misconduct, and/or unsatisfactory performance." (Exhibit B, Handbook p. 221, § 12.8.)

**28.** Section 12.8 states that corrective discipline is normally progressive and lists a Coaching Letter, a Verbal Warning, a Written Warning, a Last and Final Termination Warning, and a Letter of Termination. A Coaching Letter "is not considered a level of discipline." (Exhibit B, Handbook p. 221, § 12.8.)

**29.** Section 12.8 states that a Last and Final Termination Warning addresses "a serious violation of policy involving the safety of employees, patients, co-workers, or the general public, or the repeated violation of any policy when previous counseling has not improved behavior or performance." (Exhibit B, Handbook p. 221, § 12.8.)

**30.** Section 12.8 states that a Verbal Warning applies when "unsatisfactory performance of a more severe nature or uncorrected behavior/performance continues." (Exhibit B, Handbook p. 221, § 12.8.)

**31.** Section 12.8 further states that "disciplinary action is valid for one year from the date of incident." (Exhibit B, Handbook p. 223, § 12.8(5).)

**32.** Defendant Employer's discipline is recorded under three infraction categories: attendance, general, and driving. Defendant Employer's Employee Corrective Action form has a "Type of Infraction" section with three boxes: Driving, Attendance, and General. (Exhibit D.)

**Plaintiff's Crew and His Role**

**33.** Employee A (identified by pseudonym) is a member of the same bargaining unit, covered by the same Agreement. Employee A was Plaintiff's regular partner for approximately fifteen months. Plaintiff was the Paramedic and Employee A was the EMT. Employee A was the EMT assigned as driver in each of the four incidents described below.

**34.** Defendant Employer's EMTs drive its ambulances. Paramedics do not drive during shifts with their regular EMT partners, and EMTs do not perform patient care in the back of the ambulance when they have a Paramedic partner. Plaintiff had no physical control over steering, braking, acceleration, route selection, or any other mechanical function of the vehicle.

**35.** Defendant Employer provides Paramedics no additional driver training. Defendant Employer provides no co-driver training other than radio use, navigation, and clearing busy or blind junctions.

**36.** Neither the Agreement, nor any Memorandum of Understanding, nor any other document or notice defines the term "co-driving." The Employee Handbook

contains no co-driving section. The Employee Handbook's Vehicle Operations Policy, § 11.10, which the termination notice cites as "SOP 11.10," does not use the term "co-driving" and does not define it. (Exhibit B, § 11.10; Exhibit D.)

**37.** In 2021, Plaintiff completed a sixteen-hour Emergency Vehicle Operator Course ("EVOC") given by Defendant Employer. The 2021 EVOC course did not include a co-driver section.

**38.** Defendant Employer's termination notice cites SOP 11.10 and states that it incorporates "Basic Defensive Driving Practices as outlined in EVOC Training." (Exhibit D.) Defendant Employer has not given its employees any document that defines co-driving or states what a passenger must do to co-drive.

**39.** Plaintiff's knowledge of the discipline Defendant Employer issued to Employee A comes from Employee A, who told Plaintiff.

**First Incident: November 29, 2025**

**40.** On November 29, 2025, while responding to an emergency call with lights and sirens, the EMT assigned as driver approached a stop sign, slowed, assessed the intersection, and proceeded without coming to a complete stop.

**41.** Plaintiff did not drive the vehicle and did not control the driver's decisions. The driver reduced speed for the stop sign; Plaintiff alleges that this indicated the driver saw it. Plaintiff contends that no additional action was required of him as co-driver under the applicable requirements.

**42.** Defendant Employer's discipline of Plaintiff for the November 2025 incident was based primarily on surveillance footage of conduct by the EMT who was driving, not by Plaintiff.

**43.** Defendant Employer issued Plaintiff a Verbal Warning recorded under the general category for alleged failure to co-drive.

**44.** Defendant Employer issued Employee A discipline for the November 2025 incident, recorded under the driving category. Employee A has verbally given Plaintiff differing accounts of whether that discipline was a verbal warning or a coaching letter. Plaintiff cannot confirm the level of discipline without the Employer's record, which Plaintiff may obtain in discovery.

**45.** The footage of the November 2025 incident came from a Samsara rolling-stop-sign detection feature described below. It was not the product of a harsh event notification, and no written complaint of unsafe conduct or other policy violation was sent concerning it.

**Second Incident: The Blue Bag, February 2026**

**46.** On February 2, 2026, a medication bag (the "blue bag") was left at a patient scene. It was in a locked apartment at a secure assisted living facility.

**47.** Plaintiff immediately reported the incident, and a supervisor retrieved the bag. Plaintiff alleges that nothing was missing, no one gained unauthorized

access to it, and no patient was harmed. Plaintiff further alleges that no one was put in danger.

**48.** This was Plaintiff's first blue bag incident.

**49.** Defendant Employer issued Plaintiff a Written Warning on February 13, 2026, recorded under the general category.

**50.** Defendant Employer issued Employee A, Plaintiff's partner, a Verbal Warning recorded under the general category for the same incident.

**51.** Plaintiff is aware of at least three other employees who left the blue bag at a scene and retrieved it without incident. Those employees state that they were required to submit incident reports but received no corrective discipline. Plaintiff identifies their testimony and disciplinary records as comparator evidence to be obtained through discovery.

**Third Incident: The Fuel Incident, May 2026**

**52.** On May 5, 2026, an ambulance was returned with a low fuel level at the end of a shift.

**53.** Plaintiff repeatedly told Employee A, the EMT driver, to stop for fuel, but Employee A refused. Plaintiff was not operating the ambulance and had no physical control over its operation. Plaintiff alleges that he had no authority to compel the driver to stop and no safe means of compelling Employee A to do so.

**54.** Concerning the May 5, 2026 fuel incident, Plaintiff's immediate supervisor, Michelle Wright, told him that he would receive no further discipline.

**55.** Mr. Bailey, Defendant Employer's Director of Operations, issued Plaintiff a Last and Final Warning recorded under the general category on May 20, 2026, following the May 5, 2026 fuel incident. Defendant Employer gave no justification for departing from Ms. Wright's statement that Plaintiff would receive no further discipline.

**56.** Defendant Employer issued Employee A, the driver who refused to stop for fuel, a Written Warning recorded under the general category.

**57.** Before the meeting concerning the Last and Final Warning began, and before he spoke, Plaintiff requested Union representation in person. Mr. Bailey denied the request without giving a reason. Plaintiff informed Defendant Union of the denial, but the Union took no action in response.

**Fourth Incident: The July 26, 2026 Stop-Sign Event and Termination**

**58.** On July 26, 2026, while the crew responded to an emergency call with lights and sirens, the EMT driver approached a four-way stop sign at the intersection of Countryside Boulevard and Lake St. George Drive in Palm Harbor, Florida, reduced speed, determined it was safe to proceed, and proceeded through the intersection without a complete stop. This was the second stop-sign infraction by the EMT driver while working with Plaintiff.

**59.** Plaintiff did not drive the vehicle and did not control the driver's decisions. The driver reduced speed for the stop sign; Plaintiff alleges that this indicated the driver saw it. Plaintiff contends that no additional action was required of him as co-driver under the applicable requirements.

**60.** On information and belief, Defendant Employer issued Employee A a Written Warning recorded under the driving category for the July 26, 2026 incident. Employee A remains employed by Defendant Employer. Plaintiff cannot confirm the warning level because Employee A has verbally given differing accounts of whether it was a Written Warning or a Verbal Warning.

**61.** Defendant Employer terminated Plaintiff's employment on August 7, 2026, for an alleged failure to co-drive during an emergency response. Defendant Employer did not want Plaintiff to work his scheduled shifts on August 8 and August 9, 2026.

**62.** Defendant Employer recorded the termination under the general category, not the driving category. The Employee Corrective Action form marks the "General" box for the infraction type and lists Policy # 11.10. (Exhibit D.)

**63.** The termination notice states under Description of Infraction: "On 07/26/2026, You were not co-driving while responding. This results in a Termination." (Exhibit D.)

**64.** The notice cites SOP 11.10, "Basic Defensive Driving Practices," as the policy violated. (Exhibit D.) Defendant Employer thus cited a driving-practices policy but recorded the infraction as general.

**65.** Defendant Employer terminated the Paramedic, who had no control over the vehicle, and retained the EMT who drove through the stop sign, who had a prior stop-sign infraction.

**66.** Defendant Employer recorded all of Plaintiff's corrective actions under the general category, including the stop-sign events arising from operation of an ambulance. It recorded Employee A's discipline arising from those stop-sign events under the driving category. Defendant Employer subsequently relied upon Plaintiff's accumulated disciplinary record in terminating his employment.

**67.** Before his termination, Plaintiff had almost five years of service with Defendant Employer, first as an EMT and then as a Paramedic. Plaintiff alleges that he had never repeated an act for which he had been disciplined; he disputes that the two stop-sign events constituted repeated misconduct by him rather than conduct by Employee A.

**Defendant Employer's Use of the Samsara System**

**68.** Defendant Employer relied on Samsara vehicle monitoring footage in terminating Plaintiff. Plaintiff learned this during an investigation meeting.

**69.** The termination notice's cover sheet instructs the reviewer to show the employee Samsara footage. (Exhibit D.)

**70.** Richard Sherman, Defendant Employer's Operations Supervisor, showed Plaintiff and Employee A a clip of the July 26, 2026 footage in his office on July 29, 2026. Defendant Employer refused to show Plaintiff the full clip and showed him only approximately ten to twenty seconds.

**71.** Mr. Sherman also conducted an investigative meeting concerning the July 26, 2026 incident. He requested incident reports on July 29, 2026, and they were provided. Those reports were maintained in Defendant Employer's company email system. Plaintiff lost access to that system after his termination and can no longer access the reports.

**72.** The footage on which Defendant Employer relied came from the Samsara rolling-stop-sign detection feature. Defendant Employer's system gave no alert in the cab for failing to stop at a stop sign. No written complaint of unsafe conduct or other policy violation was sent concerning the July 26, 2026 event.

**73.** Plaintiff received no harsh event notification for either stop-sign event. No one gave Plaintiff notice of, or authorization for, review of the cab video for those events. Plaintiff's receipt of a notification and the existence of a contractual basis for the Employer's access are distinct matters; Plaintiff alleges the absence of the contractual predicates separately below.

74. The Samsara footage on which Defendant Employer based its discipline of Plaintiff for both stop-sign events, November 29, 2025 and July 26, 2026, was incidental footage. It was not captured by a harsh event or by manual activation, and it was not reviewed in response to a written complaint of unsafe conduct or other policy violation.

75. Defendant Employer did not provide Plaintiff a copy of the footage. Plaintiff does not know whether Defendant Employer gave Defendant Union a copy or whether Defendant Union viewed it.

76. The rolling-stop-sign detection feature was added to the Samsara system without notice to Plaintiff. Plaintiff was not told when the feature was activated.

77. On September 2, 2026, Brian Browne, Defendant Employer's Risk and Safety Manager, sent an email to Sunstar employees with the subject line "Zero MPH stops are the POLICY." The email stated that the Samsara system alerts when a complete stop does not occur and that failing to come to a zero-miles-per-hour stop at stop signs was triggering an alert on Defendant Employer's end. Plaintiff alleges that before that email Defendant Employer had given him nothing in writing about this feature or about that stop standard. (Exhibit E.) Plaintiff did not receive the email when it was sent because Defendant Employer had already terminated him. A colleague who remained employed later sent Plaintiff a screenshot of the email via Messenger.

**78.** September 2, 2026 was after each of the four disciplinary actions alleged above and after Plaintiff's termination.

**Requests for Information and Preservation**

**79.** On August 7, 2026, Adam Lane, Defendant Union's Chief Steward, told Plaintiff by Facebook Messenger that he had sent a request for information to Defendant Employer at 1744 hours, and that Mr. Bailey, Defendant Employer's Director of Operations, replied "received" at 1757 hours. Mr. Lane wrote on August 10, 2026 that Defendant Employer had fourteen days to reply.

**80.** On August 8, 2026, Plaintiff sent Defendant Employer a request to preserve evidence by United States Postal Service certified mail with tracking. It asked Defendant Employer to preserve the Samsara footage on which it based the termination, including the footage of the July 26, 2026 stop-sign incident. The USPS tracking record shows the request was delivered and signed for on August 11, 2026. The request asked Defendant Employer to confirm receipt. Defendant Employer did not confirm receipt.

**81.** On August 10, 2026, three days after his termination, Plaintiff lost access to communications in his work email account. Plaintiff alleges that Defendant Employer deleted that account on that date. Plaintiff notified Mr. Lane by Facebook Messenger. On August 15, 2026, Mr. Lane wrote that he would make sure Plaintiff received a copy of the Union's decision not to file a grievance.

Plaintiff never received a formal copy of that letter; Mr. Lane sent only a screenshot by Facebook Messenger.

**82.** On August 31, 2026, Plaintiff mailed a demand letter to Defendant Employer, addressed to Richard Schomp, Chief Operating Officer of Sunstar Paramedics, at 12490 Ulmerton Road, Largo, Florida 33774, by United States Postal Service certified mail with tracking. Plaintiff also sent a copy to Defendant Employer's registered agent, Corporation Service Company, at the address stated above. The USPS online tracking record shows delivery on September 1, 2026. On September 2, 2026, Defendant Employer distributed the "Zero MPH stops are the POLICY" email described above.

**83.** Plaintiff also requested copies of his personnel files. Defendant Employer did not produce them.

**84.** Plaintiff does not know whether the Samsara footage still exists.

**Defendant Union's Handling of Plaintiff's Grievance**

**85.** On August 7, 2026, the day he was terminated, Plaintiff messaged Mr. Lane: "They just terminated my employment. I need a grievance filed through the union and I will be seeking external legal action." Mr. Lane replied that he would file a request for information "and file for arbitration."

**86.** On August 18, 2026, Plaintiff asked Mr. Lane to confirm that a grievance had been filed. Mr. Lane answered that a terminated employee "jumps

over grievance level 1 and 2 and goes straight to arbitration." The response described the procedure but did not expressly confirm that a grievance or arbitration demand had been filed.

**87.** No grievance was ever filed challenging Plaintiff's termination, although Plaintiff requested one on August 7, 2026. Plaintiff alleges that the Union's statements that termination matters proceeded directly to arbitration did not result in a filed termination grievance.

**88.** Plaintiff also asked Defendant Union to file grievances concerning the November 29, 2025 Verbal Warning and the May 20, 2026 Last and Final Warning. Defendant Union did not act on those requests.

**89.** Plaintiff told Defendant Union about the different discipline imposed on Employee A and that Defendant Employer refused to show him what Plaintiff described as the full 180-second clip. Defendant Union did not respond to those points, did not interview Employee A, and did not compare Employee A's discipline with Plaintiff's.

**90.** Before declining arbitration, Defendant Union did not interview Plaintiff or ask him any question about the July 26, 2026 incident or the other three disciplinary actions. Plaintiff therefore had no interview in which to answer questions about those incidents or the factual basis of the disciplinary record.

**91.** On August 24, 2026, Mr. Lane messaged Plaintiff that Defendant Union had "voted to not proceed with arbitration."

**92.** In a later message the same day, Mr. Lane wrote: "Arbitration is voted on evidence based actions that create a reasonable sense of suspicion." He wrote that the November 29, 2025 Verbal Warning "is well outside of any grievance or arbitration standing"; that the February 13, 2026 Written Warning "was a founded event when you had left your blue bag on scene"; that the May 20, 2026 Last and Final Warning "was a failure to complete end of shift duties"; and that, as to the termination, "samsara video shows clear footage of you reclined in your seat with your eyes closed when a stop sign was run which they are saying is failure to co-drive."

**93.** Mr. Lane concluded: "None of the things that we read or saw was able to create enough suspicion that sunstar was wrongfully disciplining you to a point of termination."

**94.** The statement concerning Plaintiff's posture and eyes does not appear in the termination notice. (Exhibit D.)

**95.** Mr. Lane's message did not state that Defendant Union had filed a grievance, interviewed anyone, or compared Plaintiff's discipline with Employee A's. Defendant Union did not tell Plaintiff who handled his matter or how it

reached its decision. Plaintiff distinguishes that absence of disclosure from his allegations above concerning interviews and investigative steps that did not occur.

**96.** All of Mr. Lane's communications with Plaintiff were by Facebook Messenger. Defendant Union never gave Plaintiff a formal letter concerning its decision.

**97.** Defendant Union did not represent Employee A in connection with the discipline Employee A received. Plaintiff separately alleges that Defendant Union did not interview Employee A as a witness concerning the incidents underlying Plaintiff's disciplinary record.

**98.** On October 13, 2026, Plaintiff sent a "Request for Complete Grievance File and Preservation of Records" by email to Defendant Union's board members and by tracked mail to national IAEP. Plaintiff received confirmation of receipt.

**99.** The letter asked Defendant Union for a complete copy of its file concerning the November 29, 2025 Verbal Warning, the February 13, 2026 Written Warning, the May 20, 2026 Last and Final Warning, and the August 7, 2026 termination. It also requested every grievance, request for information, appeal, arbitration demand, or other contractual action concerning those matters, together with records relating to the Union's decision not to pursue arbitration, including records showing whether a grievance or arbitration demand was filed,

the date and basis of the decision not to arbitrate, and the investigation conducted by the Union.

**100.** The letter also asked Defendant Union to preserve paper records and electronically stored information relating to Plaintiff's employment, discipline, termination, and grievance; the decision whether to arbitrate; Samsara recordings and monitoring-system records; comparator discipline; and communications with Defendant Employer, national representatives, and Union counsel. It asked Defendant Union to suspend routine deletion or destruction of those records.

**101.** The letter requested production of available records and a written response within ten calendar days, by October 23, 2026. On October 13, 2026, Mr. Lane acknowledged receipt by email. As of the filing of this Complaint, Defendant Union has not produced the requested records or sent a further response to the records request, and national IAEP has not sent a further response to that request.

**102.** Defendant Union did not advise Plaintiff that he could appeal its decision not to pursue his grievance. Plaintiff alleges that Defendant Union first provided information concerning an internal appeal on October 14, 2026, the day after Plaintiff sent the request described above and after the period identified by the Union for taking such an appeal had expired.

## EXHAUSTION OF CONTRACTUAL REMEDIES AND TIMELINESS

**103.** Immediately after his termination on August 7, 2026, Plaintiff asked the Union to file a grievance challenging the termination. The Union informed Plaintiff that a terminated employee proceeded directly to arbitration.

**104.** Under Article 21.2.3 of the CBA, only the Union, in its sole discretion, could demand arbitration. Plaintiff therefore could not independently invoke arbitration after the Union declined to proceed.

**105.** On August 24, 2026, the Union informed Plaintiff that it had voted not to proceed with arbitration.

**106.** Plaintiff alleges that the Union did not advise him before or when it declined arbitration that an internal Union appeal procedure existed. The Union first provided appeal information on October 14, 2026, after the appeal period identified by the Union had expired. This internal appeal was distinct from the contractual grievance and arbitration procedure controlled by the Union.

**107.** Because the Union controlled access to arbitration and declined to invoke it, Plaintiff could not further pursue the contractual grievance and arbitration procedure on his own. Plaintiff relies separately on the late disclosure of the internal Union appeal procedure alleged above concerning his failure to pursue that appeal.

**108.** Plaintiff brings this hybrid action concerning his August 7, 2026 termination within six months of the Union's August 24, 2026 notification that it would not proceed to arbitration.

## COUNT I

## BREACH OF COLLECTIVE BARGAINING AGREEMENT

**Against Defendant Employer**

**109.** Plaintiff realleges and incorporates paragraphs 5 through 108 as though fully set forth herein.

**110.** Defendant Employer was bound at all relevant times by the CBA effective October 1, 2024 through September 30, 2027.

**111.** Article 20.1 provides that Defendant Employer may discharge and discipline employees only for just cause.

**112.** Appendix F, incorporated into the CBA through Article 19.6, restricts Defendant Employer's access to and disciplinary use of vehicle-monitoring recordings.

**113.** Defendant Employer progressively disciplined Plaintiff through a November 29, 2025 Verbal Warning, a February 13, 2026 Written Warning, and a May 20, 2026 Last and Final Warning before terminating him on August 7, 2026.

**114.** The August 7, 2026 termination was based upon Plaintiff's alleged failure to "co-drive" during the July 26, 2026 emergency response, although Plaintiff was the passenger and Employee A was the EMT operating the ambulance.

**115.** Defendant Employer's termination notice cited SOP 11.10 concerning vehicle operations but classified Plaintiff's infraction as "General," while Defendant Employer classified Employee A's discipline arising from the stop-sign events as "Driving."

**116.** Plaintiff alleges that neither the CBA, Appendix F, nor the policy cited in the termination notice defined "co-driving." Plaintiff further alleges that those documents did not specify the passenger conduct that Defendant Employer later treated as grounds for termination.

**117.** Defendant Employer used Samsara cab-camera video to discipline and terminate Plaintiff. Paragraph D of the incorporated MOU limits access to the crew cab camera's video functionality to review of a harsh event notification or response to a written complaint of unsafe conduct or other policy violation. Plaintiff alleges that neither predicate existed for the stop-sign event on which Defendant Employer relied.

**118.** Paragraph I of Appendix F provides that affected employees and appropriate Union representatives will be allowed to view recorded images used as

disciplinary evidence and will be provided a copy upon request. Plaintiff alleges that Defendant Employer used recorded event information as disciplinary evidence but did not provide him a copy of the recording.

**119.** Plaintiff further alleges that the progressive disciplinary record on which Defendant Employer relied was inconsistent with just cause because Defendant Employer issued Plaintiff a Written Warning for his first blue-bag incident even though he immediately reported the bag, it was recovered without loss, and Plaintiff is aware of other employees who state that comparable incidents resulted in incident reports but no corrective discipline. Defendant Employer also issued Plaintiff a Last and Final Warning for the fuel incident after Plaintiff's supervisor told him he would receive no further discipline, while issuing Employee A, who Plaintiff alleges refused to stop for fuel, a Written Warning. Plaintiff repeatedly instructed Employee A to stop for fuel, but Employee A refused; Plaintiff was not operating the ambulance, had no physical control over its operation, and had no safe means of compelling Employee A to stop.

**120.** Plaintiff's claim rests on the CBA's just-cause requirement and the incorporated restrictions in Appendix F. Plaintiff alleges that his termination lacked just cause because it rested upon an alleged co-driving obligation not defined in the CBA, the MOU, or the policy cited in the termination notice; accumulated progressive discipline; different classifications of Plaintiff's and

Employee A's discipline arising from the stop-sign events; and Samsara evidence that Plaintiff alleges Defendant Employer accessed or used contrary to Appendix F.

**121.** By disciplining and terminating Plaintiff under the circumstances alleged above, Defendant Employer breached Article 20.1 and Appendix F of the CBA.

**122.** As a result of Defendant Employer's breach, Plaintiff lost wages and employment benefits and suffered other recoverable damages in an amount to be determined.

WHEREFORE, Plaintiff demands judgment against Defendant Employer on Count I as set forth in the Prayer for Relief below.

## COUNT II

## BREACH OF DUTY OF FAIR REPRESENTATION

**Against Defendant Union**

**123.** Plaintiff realleges and incorporates paragraphs 5 through 108 as though fully set forth herein.

**124.** Defendant Union was Plaintiff's exclusive bargaining representative and represented bargaining-unit employees in disputes arising under the CBA.

**125.** Under Article 21.2.3 of the CBA, only Defendant Union could demand arbitration. Plaintiff could not independently submit his termination grievance to arbitration.

**126.** Plaintiff timely asked Defendant Union to challenge his August 7, 2026 termination. The Union initially represented that it would request information and proceed toward arbitration but subsequently decided not to proceed.

**127.** Before making that decision, Defendant Union did not interview Plaintiff concerning the July 26, 2026 event or the preceding disciplinary actions on which Defendant Employer relied.

**128.** Defendant Union did not interview Employee A, the EMT who was operating the ambulance during the July 26, 2026 stop-sign event and who had also been the driver during the November 29, 2025 stop-sign event.

**129.** Plaintiff informed Defendant Union that Defendant Employer imposed different discipline upon Employee A, classified Plaintiff's stop-sign discipline as "general" while classifying Employee A's discipline arising from the stop-sign events as "driving," and refused to show Plaintiff the complete Samsara recording. Defendant Union did not investigate or address those matters with Plaintiff before declining arbitration.

**130.** Defendant Union's stated explanation for declining arbitration relied in part upon Samsara footage that it described as showing Plaintiff reclined with his

eyes closed. Defendant Employer's termination notice identifies the infraction as Plaintiff being "not co-driving while responding" but does not expressly describe Plaintiff's posture or eyes.

**131.** Defendant Union did not advise Plaintiff whether it evaluated Defendant Employer's authority under Appendix F to access or use the Samsara recording as disciplinary evidence, even though Appendix F was expressly incorporated into the CBA.

**132.** Defendant Union also did not advise Plaintiff whether it investigated Defendant Employer's different disciplinary treatment of Plaintiff and Employee A or Plaintiff's contention that the progressive discipline relied upon unrelated incidents classified under the general category.

**133.** On August 24, 2026, Defendant Union informed Plaintiff that it had voted not to proceed to arbitration. Defendant Union did not provide Plaintiff with a formal written decision or advise him at that time of an internal procedure for appealing that determination.

**134.** Defendant Union first informed Plaintiff about an internal appeal procedure on October 14, 2026, after Plaintiff demanded his grievance file and after the appeal period identified by the Union had expired.

**135.** Plaintiff subsequently requested the Union's complete grievance file and records identifying what investigation it performed and what contractual

actions, if any, it had taken. Defendant Union acknowledged Plaintiff's request but, as of the filing of this Complaint, has not produced those records.

**136.** The Union possessed exclusive control over Plaintiff's access to binding arbitration. Plaintiff alleges that it declined to pursue that remedy without interviewing Plaintiff or Employee A, investigating the identified comparator discipline, addressing the contractual restrictions on the Samsara evidence, or meaningfully investigating Defendant Employer's classification and progressive-discipline rationale.

**137.** Plaintiff alleges that Defendant Union's handling of his termination grievance was arbitrary because it declined the only avenue to binding arbitration without conducting a meaningful investigation into readily identifiable facts bearing directly upon whether Defendant Employer had just cause to terminate Plaintiff. The alleged breach concerns the Union's handling of the material factual and contractual issues identified above, rather than its decision against arbitration standing alone.

**138.** Because Defendant Union alone controlled access to arbitration, its refusal to proceed prevented Plaintiff from obtaining arbitral review of Defendant Employer's alleged breach of the CBA. The issues left without arbitral review included the just-cause basis for termination, the progressive disciplinary record, the differing disciplinary classifications, and the contractual restrictions on

Samsara evidence. Plaintiff alleges that the investigative omissions described above concerned these material issues and impaired the handling of his termination challenge.

**139.** Defendant Union thereby breached its duty of fair representation.

**140.** Defendant Union's alleged breach prevented Plaintiff from obtaining contractual review of the termination and disciplinary record. Plaintiff seeks damages attributable to that breach, as permitted by law, distinct from damages attributable solely to Defendant Employer's breach.

WHEREFORE, Plaintiff demands judgment against Defendant Union on Count II as set forth in the Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and:

**a.** Award Plaintiff back pay and lost employment benefits attributable to Defendant Employer's breach of the CBA;

**b.** Order Plaintiff reinstated to his former position, or award such alternative relief as the Court determines appropriate;

**c.** Order appropriate correction or expungement of disciplinary records found to have been imposed in violation of the CBA;

**d.** Award against Defendant Union such damages attributable to its breach of the duty of fair representation as are permitted by law;

**e.** Award pre-judgment and post-judgment interest to the extent permitted by law;

**f.** Award Plaintiff his taxable costs; and

**g.** Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 2, 2026

Respectfully submitted,

K. McCarthy

Kenneth McCarthy

Plaintiff, Pro Se

6347 Nearco Drive

Port Richey, Florida 34668

Phone: 347-334-4526

Email: clelanm93@gmail.com